[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 03-13540

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 12, 2007
THOMAS K. KAHN
CLERK

D. C. Docket No. 01-08287-CV-DTKH

DADELAND DEPOT, INC.,
DADELAND STATION ASSOCIATES, LTD.,

                                        Plaintiffs-Appellants,

versus

ST. PAUL FIRE AND MARINE INSURANCE CO.,
AMERICAN HOME ASSURANCE COMPANY,

                                        Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**ON PETITION FOR REHEARING**

(April 12, 2007)

Before BIRCH and WILSON, Circuit Judges, and DOWD,* District Judge.

BIRCH, Circuit Judge:

_____

*Honorable David D. Dowd, Jr., U.S. District Judge for the Northern District of Ohio,
sitting by designation.

Upon review of the defendants' timely petition for rehearing, requesting that we reconsider that portion of our opinion granting the plaintiffs' attorneys' fees incident to this appeal, we agree that Dadeland is not yet entitled to attorneys' fees under the applicable Florida statute. Accordingly, we vacate that portion of our opinion, see No. 03-13540, ___ F.3d ___ (11th Cir. Feb. 27, 2007), and substitute the following revised opinion in its place.

This case returns to us for disposition from the Supreme Court of Florida, to which we certified five questions of Florida state law. See Dadeland Depot, Inc. v. St. Paul Fire and Marine Ins. Co., 383 F. 3d 1273 (11th Cir. 2004). Based on the Florida Supreme Court's responses to those questions, see Dadeland Depot Inc. v. St. Paul Fire and Marine Ins. Co., No. SC04-1828 (Fla. December 21, 2006), we now conclude that the district court erred in its disposition of the defendants' summary judgment motion and of the plaintiffs' motion for partial summary judgment. Accordingly, we REVERSE the grant of summary judgment in favor of the defendants, GRANT the plaintiffs' motion for partial summary judgment, and REMAND this case for further proceedings consistent with this opinion. We also GRANT the plaintiffs' motion for attorneys' fees on appeal, conditioned, however, on appellant's ultimate recovery in the trial court. See McDonald v. Southeastern Fid. Ins. Co., 373 So.2d 94 (Fla. Dist. Ct. App. 1979).

2

# I. BACKGROUND

The procedural history, facts, and issues of this case are summarized in our previous opinion, published at 383 F.3d 1273 (11th Cir. 2004). For purposes of background, this appeal arises out of a lengthy and complicated dispute between Dadeland Station Associates, Ltd. and Dadeland Depot., Inc. (collectively, "Dadeland"), a lessor and manager of commercial properties, and St. Paul Fire and Marine Insurance Co. and American Home Assurance Co. (collectively, "St. Paul"), who acted as the sureties on a performance bond issued in connection with a shopping center that Dadeland was developing.

A number of structural and design defects were subsequently discovered with the development, and the parties–Dadeland, St. Paul, and the general contractor, Walbridge Contracting, Inc. ("Walbridge")–entered into an arbitration proceeding to resolve the disputes over the construction. At the conclusion of the proceeding, Dadeland obtained an award in the amount of $1,417,842 for the contractor's defective workmanship. St. Paul, as surety, was bound to that award to the extent that the principal, Walbridge, was bound. Walbridge timely paid the award.

Dadeland then brought this action in the Fifteenth Judicial Circuit of Florida, alleging that St. Paul, as sureties, had acted with bad faith and had failed to

3

perform its duties under the performance bond. Specifically, Dadeland alleged that St. Paul had intentionally attempted to avoid and delay the arbitration as it had been unfolding; that St. Paul had effectively ignored its obligations under the bond by repeatedly failing to address Dadeland's complaints concerning the defects with the development; and that St. Paul had done so without ever conducting any independent investigation into Dadeland's complaints. Dadeland asserted claims against St. Paul for bad-faith refusal-to-settle, Fla. Stat. § 624.155 (1)(b)(1), and unfair insurance practices, Fla. Stat. § 624.155 (1)(a)(1).[1]

After removing this case to federal court, St. Paul filed a motion for summary judgment or for judgment on the pleadings. Dadeland filed a separate motion for partial summary judgment on the narrow question of whether St. Paul was collaterally estopped from raising defenses that had been raised and disposed of in the earlier arbitration proceeding. The district court granted summary judgment in favor of St. Paul on all counts of Dadeland's complaint, and denied Dadeland's motion for partial summary judgment. The district court then entered final judgment in favor of St. Paul. This appeal followed.

---

[1] As is discussed subsequently, Florida's Insurance Code allows an insured person to bring an unfair trade action against an "insurer" when the insurer engages in unfair claim settlement practices–that is, a violation of Fla. Stat. § 626.9541(1)(i). See Fla. Stat. § 624.155(1)(a)(1).

## II. DISCUSSION

Dadeland argues that the district court erred in granting summary judgment in favor of St. Paul and in denying its motion for partial summary judgment. We review a district court's grant of summary judgment <u>de novo</u>, applying the same legal standard used by the district court. <u>Johnson v. Bd. of Regents</u>, 263 F.3d 1234, 1242 (11th Cir. 2001). Under that standard, summary judgment is appropriate where "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." <u>Id.</u> (citing Fed. R. Civ. P. 56(c)). In reviewing the motion, we view the evidence and all factual inferences in a light most favorable to the non-moving party, and all reasonable doubts about the facts are resolved in favor of the non-movant. <u>Id.</u> at 1243 (citation and internal quotations omitted).

"The plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" <u>Johnson</u>, 263 F.3d at 1243 (quoting <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552-53 (1986)). That is, "[i]f the non-moving party fails to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof, then the court must enter

5

summary judgment for the moving party." Gonzalez v. Lee County Hous. Auth., 161 F.3d 1290, 1294 (11th Cir. 1998) (quoting Celotex, 477 U.S. at 323, 106 S. Ct. at 2552) .

In this case, the district court granted summary judgment for St. Paul as a matter of law. More specifically, the district court's decision hinged on three points of Florida law.[2] First, the district court concluded that Dadeland was not entitled to bring an action for a bad-faith refusal-to-settle an insurance claim under Fla. Stat. § 624.155(1)(b)(1) because it had not established the validity of the underlying claim, which is a condition precedent to bringing such an action under Florida law. Second, the district court concluded that the earlier arbitration proceeding would have a res judicata effect on Dadeland's current claim for damages against St. Paul, and that, consequently, Dadeland was now barred from "com[ing] to this court to assert the same claim against [St. Paul]." R3-137 at 23. Finally, the district court concluded that Dadeland had failed to allege a general business practice on the part of St. Paul, which the district court believed was a pre-requisite to bringing a claim under Fla. Stat. § 624.155 (1)(a)(1). Id. at 28. Based on those determinations, it granted summary judgment in favor of St. Paul.

---

[2] The court did not discuss in depth whether there were genuine issues of material fact that would preclude a grant of summary judgment; its decision was grounded primarily in legal conclusions rather than an assessment of the sufficiency of the evidence.

As to Dadeland's separate motion for partial summary judgment on the issue of whether the earlier arbitration proceeding would collaterally estop St. Paul from raising the same affirmative defenses in the current case, the district court concluded that the issue was moot in light of its prior finding that Dadeland's claims were barred by res judicata. Accordingly, the district court denied Dadeland's motion for partial summary judgment on that issue.

On appeal, Dadeland contends that the district court's conclusions were legally erroneous, and that therefore summary judgment was improperly granted to St. Paul. In addition, Dadeland argues that the disposition of the arbitration proceeding collaterally estops St. Paul from raising the same defenses in the current proceeding, and that therefore it was entitled to partial summary judgment on that issue. We address each of these contentions in turn, guided by the unambiguous responses of the Florida Supreme Court to the questions that we certified.

A.    District Court's Grant of Summary Judgment In Favor of St. Paul

1. Standing

As a preliminary issue, we address the question of Dadeland's standing to bring an action for bad-faith refusal-to-settle an insurance claim under Fla. Stat. § 624.155(1)(b)(1). Under the language of Florida's insurance code, any person may bring a civil action against an insurer when the insurer does not attempt "in good

faith to settle claims when, under all the circumstances, it could and should have done so, had it acted fairly and honestly toward its insured and with due regard for her or his interests." Fla. Stat. § 624.155(1)(b)(1). The district court began its summary judgment order by querying whether an owner-obligee of a surety bond constituted an "insured" for purposes of the statute. The court also questioned whether the contractual obligations imposed in a surety relationship could properly be construed as insurance "claims" so as to give rise to a cause of action under Fla. Stat. § 624.155(1)(b)(1). Noting the differences between a traditional insurance relationship and a suretyship, the district court expressed doubt as to "whether an obligee may sue a surety under the bad faith insurer provision for its alleged refusal to perform its contractual duties." R3-137 at 17. The district court assumed, for purposes of its disposition, that an owner-obligee was an "insured" who could bring an action against a surety under § 624.155(1)(b)(1).

Although the district court did not rule on the issue, we found that, as a threshold matter, the question of Dadeland's standing to bring a § 624.155(1)(b)(1) was important enough that it warranted clarification by the Florida Supreme Court. Therefore, we certified the following question to the Florida Supreme Court:

> IS THE OBLIGEE OF A SURETY CONTRACT CONSIDERED AN "INSURED" SUCH THAT THE OBLIGEE HAS THE RIGHT TO SUE THE SURETY FOR BAD-FAITH REFUSAL TO SETTLE CLAIMS UNDER § 624.155(1)(b)(1)?

8

Dadeland, 383 F.3d at 1276.

The Florida Supreme Court answered that question in the affirmative. In its response, the court considered a number of factors, including its prior case law; the fact that a surety is defined elsewhere in the Florida insurance code as an "insurer," see Fla. Stat. § 624.03; the plain language of § 624.155(1)(b)(1); other jurisdictions' treatment of the question; and the legislative history of § 624.155(1)(b)(1). After a detailed analysis, the court unambiguously held that an obligee in a surety relationship does indeed constitute an "insured" for purposes of § 624.155(1)(b)(1). In light of that response, it is clear, as a preliminary matter, that Dadeland, as obligee, has standing to pursue this action against St. Paul, its surety, for its alleged bad-faith refusal-to-settle. We now turn to the district court's disposition of Dadeland's claim.

2. Whether Dadeland Satisfied the Condition Precedent Under § 624.155(1)(b)(1)

In its summary judgment order, the district court observed that, in order to bring a bad-faith refusal-to-settle claim under § 624.155(1)(b)(1), a plaintiff had to establish that he was entitled to a payment of the claim, either via a judicial adjudication of damages in the plaintiff's favor or via a settlement agreement.[3] In

---

[3] Prior to bringing an action for bad-faith refusal-to-settle an insurance claim against an insurer, Florida law requires that the plaintiff demonstrate "that there has been a determination of

9

Dadeland's case, the arbitration panel imposed liability on Dadeland's contractor, Walbridge, in the amount of $1,417,842, and then stated in its decision that "[t]he surety is bound to this award to the extent that its principal is obligated under the award and its defenses are denied." R2-71, Exh. 23 at 5. The district court concluded, however, that the arbitration panel's decision was not sufficient to establish that Dadeland was entitled to payment of its claim under the performance bond with St. Paul. In the absence of some judicial determination that St. Paul had breached an obligation under the performance bond and was liable for a "sum certain," the court concluded that Dadeland had failed to satisfy the condition precedent necessary for an action for the bad-faith refusal-to-settle a claim, and that, therefore, its action failed as a matter of law. R3-137 at 20. Accordingly, the district court granted summary judgment in favor of St. Paul.

Dadeland appeals that decision, arguing that the arbitration panel's award, and its finding that St. Paul was bound by it to the extent that Walbridge was unable to pay it, was sufficient to establish the condition precedent necessary to bringing a § 624.155(1)(b)(1) claim under Florida law. Because we were unclear as to the

the insured's damage." Talat Enters., Inc. v. Aetna Cas. & Sur. Co., 952 F. Supp. 773, 776 (M.D. Fla. 1996), aff'd, 217 F.3d 1318 (11th Cir. 2000). Florida courts have stated that the purpose of this condition precedent is "to show that the insured had a valid claim." Brookins v. Goodson, 640 So. 2d 110, 112 (Fla. Dist. Ct. App. 1994).

effect of the arbitration panel's earlier decision on Dadeland's bad-faith action, we certified the following question to the Florida Supreme Court:

> IS THE ARBITRATOR'S FINDING THAT A SURETY'S PRINCIPAL HAS BREACHED ITS DUTY TO THE OBLIGEE, AND THAT THE SURETY IS BOUND TO THE ARBITRATION AWARD TO THE EXTENT THAT ITS PRINCIPAL IS BOUND, SUFFICIENT TO SATISFY THE CONDITION PRECEDENT TO A LATER BAD-FAITH REFUSAL-TO-SETTLE CLAIM THAT THERE BE A PRIOR ADJUDICATION THAT THE PLAINTIFFS WERE ENTITLED TO A PAYMENT OF A CLAIM FROM THE SURETIES?

Dadeland, 383 F.3d at 1278.

The Florida Supreme Court answered this question in the affirmative. The court observed that a plaintiff bringing a § 624.155(1)(b)(1) action for an insurer's bad-faith refusal-to-settle a claim only needs to establish the validity of the underlying claim. The court held that this threshold would be satisfied by alleging that "a determination has been made with regard to 'the existence of liability on the part of [an uninsured principal]' and 'the extent of the plaintiff's damages.'" Dadeland, No. SC04-1828, slip. op. at 37 (citation omitted).

In the context of Dadeland's case, the court concluded that an arbitration panel's award of damages against an uninsured principal was a sufficient determination of liability so as to show the validity of the insured's underlying claim against the insurer. The court observed that the arbitration panel had made clear that the principal (Walbridge) had breached a duty to the obligee, Dadeland,

11

and that St. Paul, as the surety on the bond, was bound to the extent of Walbridge's liability. It found that this evidence was sufficient to establish the validity of Dadeland's underlying claim against St. Paul, and that therefore Dadeland had satisfied the condition precedent necessary to bringing a § 624.155(1)(b)(1) action. Thus, under Florida law, Dadeland was entitled to proceed with its claim against St. Paul.

In light of the Florida Supreme Court's response to this question, we conclude that the district court erred in concluding that Dadeland had failed to satisfy the condition precedent necessary to bringing a § 624.155(1)(b)(1) action and in granting summary judgment for St. Paul on that basis.

3. Applicability of <u>Res Judicata</u> on Dadeland's Action

The district court further concluded that Dadeland's claim against St. Paul was barred by the doctrine of <u>res judicata</u>. The court suggested that Dadeland's claim against St. Paul was more properly construed as a breach of contract claim for its refusal to perform under the terms of the bond. Finding that Dadeland could have and should have brought that claim in its earlier arbitration proceeding, the court stated that <u>res judicata</u> would bar Dadeland from bringing its current action against St. Paul.[4]

---

[4] Under Florida law, in order for <u>res judicata</u> to apply "there must be a concurrence of the following conditions: 1) identity of the thing sued for, 2) identity of the cause of action, 3)

12

Dadeland appeals that decision, arguing that its present action is a separate count against St. Paul for its bad-faith refusal-to-settle–not a standard breach of contract claim–and that Dadeland could not have possibly asserted that count against St. Paul in the arbitration proceeding, because at the time of the arbitration it had not yet established the validity of its underlying claim. Because we were unclear as to the effect of the earlier arbitration on Dadeland's action, we certified the following question to the Florida Supreme Court:

> IS [THE] ARBITRATOR'S DECISION RES JUDICATA, THUS BARRING DADELAND'S LATER CLAIM AGAINST THE SURETIES FOR BAD-FAITH REFUSAL TO SETTLE?

Dadeland, 383 F.3d at 1278.

The Florida Supreme Court answered that question in the negative. It agreed with Dadeland that its current claim was separate and independent from any breach of contract claim that Dadeland might have asserted in the arbitration proceeding. In addition, the court agreed that Dadeland's § 624.155(1)(b)(1) action had not yet accrued at the time of the arbitration proceeding, as Dadeland had not yet

---

identity of the persons and parties to the actions, and 4) identity of the quality or capacity of the person for or against whom the claim is made." ICC Chem. Corp. v. Freeman, 640 So. 2d 92, 93 (Fla. Dist. Ct. App. 1994) (per curiam) (citation omitted). Res judicata applies both to claims actually raised and determined in the prior action, and to claims that *could have been raised* and determined in the prior action. See State v. McBride, 848 So. 2d 287, 290 (Fla. 2003). The district court found that "the relief sought by Dadeland in this case could have been granted in the earlier arbitration proceeding, the facts necessary to the maintenance of the two actions are identical, and Dadeland and the sureties were parties to the prior action. All conditions required for a finding of res judicata are present." R3-137 at 23.

established a breach on the part of Walbridge or an entitlement to payment under the performance bond. Because Dadeland's § 624.155(1)(b)(1) action had not yet accrued at the time of the arbitration, the court concluded that res judicata would not bar Dadeland from bringing its § 624.155(1)(b)(1) claim in the present action.

In light of the Florida Supreme Court's response, it is clear that res judicata does not bar Dadeland from pursuing the current § 624.155(1)(b)(1) action against St. Paul. The district court erred in concluding otherwise, and in granting summary judgment to St. Paul on that basis.

4. Requirement of a General Business Practice to Pursue an Unfair Trade Claim in connection with a § 624.155 Action

The district court also concluded that Dadeland did not present evidence to establish that St. Paul's alleged conduct constituted a general business practice. The court stated that in order for a plaintiff to bring a § 626.9541(1)(i) action against an insurer–through the conduit of § 624.155–a plaintiff was required to provide evidence that the unfair settlement practice complained of was a "general business practice." R3-137 at 27. Because Dadeland had failed to allege a general business practice on the part of St. Paul, the court construed Dadeland's § 626.9541(1)(i) claim as being waived.[5]

---

[5] In order to understand the district court's decision, some background as to Florida's statutory scheme is necessary. With respect to insurance practices, Florida's unfair trade statute

14

Because the Florida Supreme Court had not addressed whether § 624.155

eliminated the need for proof of a general business practice, we certified the

following question to the Florida Supreme Court:

> DOES THE LANGUAGE IN § 624.155(1)(B)(3) ELIMINATE § 626.9541's REQUIREMENT OF PROOF OF A GENERAL BUSINESS PRACTICE WHEN THE PLAINTIFF IS PURSUING [AN UNFAIR TRADE] CLAIM THROUGH THE RIGHT OF ACTION PROVIDED IN § 624.155?

Dadeland, 383 F.3d at 1277 (emphasis omitted).  The Florida Supreme Court

answered that question in the affirmative, holding that the plain language of §

624.155(1)(b)(3) made clear that a plaintiff suing under § 624.155 does *not* need to

allege a general business practice.  The court construed the exceptional language of

§ 624.155(1)(b)(3) as applying to § 624.155 in its entirety, and, accordingly,

concluded that the need for a general business practice was eliminated when an

unfair trade count was sought pursuant to § 624.155.

---

specifically requires proof of a "general business practice" on the part of the insurer to support the plaintiff's cause of action.  See Fla Stat. § 626.9541(i)(3).

However, Florida's insurance code, Fla. Stat. § 624.155(1)(a)(1), separately permits an insured person to bring an action against an insurer for bad faith settlement practices, if the insured person is "damaged . . . [b]y a violation of . . . section 626.9541(1)(i) . . . ."  In other words, the insurance code permits an insured person to allege an unfair insurance practice through the conduit of § 624.155.  Section 624.155(1)(b)(3) states that "a person pursuing a remedy under this section *need not prove that such act was committed or performed with such frequency as to indicate a general business practice*" (emphasis added).  The district court, however, held that proof of a general business practice *was* required to bring a claim under § 624.155, and in so doing, it apparently concluded that the language in § 624.155(1)(b)(3) applied only to subsection (b) of § 624.155–not to subsection (1)(a).

15

In light of the answer of the Florida Supreme Court, is clear that Dadeland was not obligated to allege a general business practice in order to assert a § 626.9541 claim through the cause of action provided in § 624.155. The district court erred in concluding otherwise, and in treating Dadeland's § 626.9541 claim as being waived. The response of the Florida Supreme Court makes clear that it was improper to grant summary judgment for St. Paul on that basis.

5. Genuine Issues of Fact

Despite the fact that the district court committed the foregoing errors of Florida law in granting summary judgment for St. Paul, we might nevertheless affirm the district court's grant of summary judgment for St. Paul if we found there were no genuine issues of material fact remaining in the dispute between St. Paul and Dadeland. Rule 56 makes clear that "[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "A dispute about a material fact is 'genuine' if the 'evidence is such that a reasonable jury could return a verdict for the non-moving party.'" Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 594 (11th Cir. 1995) (per curiam) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986)).

16

"The inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. (quoting Anderson, 477 U.S. at 251-52, 106 S. Ct. at 2512).

The $26.5 million performance bond that was issued in connection with Dadeland's construction project set forth St. Paul's obligations as surety on the bond. Its relevant provisions state that St. Paul's obligations shall arise after Dadeland "has declared a Contractor Default and [has] formally terminated the Contractor's right to complete the contract . . . ." R2-71, Exh. A at 2. When that condition is met, the bond states that St. Paul "shall promptly and at [St. Paul]'s expense take one of the following actions:"

> 4.1 Arrange for the Contractor, with the consent of [Dadeland], to perform and complete the Construction Contract; or
> 4.2 Undertake to perform and complete the Construction Contract itself . . . ; or
> 4.3 Obtain bids and negotiated proposals from qualified contractors acceptable to [Dadeland] for a contract performance and completion of the Construction Contract . . . ; *or*
> 4.4 *Waive its right to [take those steps] and with reasonable promptness under the circumstances:*
> > *.1 After investigation, determine the amount for which it may be liable to [Dadeland], and, as soon as practicable after the amount is determined, tender payment therefor to [Dadeland]; or*
> > *.2 Deny liability in whole or in part and notify [Dadeland] citing reasons therefor.*

R2-71, Exh. A at 2 (emphasis added). Thus, under the terms of the bond, once

17

Dadeland had declared a "Contractor Default" on the part of Walbridge, St. Paul was legally obligated either to arrange for the contractor to complete the project, to obtain a satisfactory substitute contractor to complete the project, or, "with reasonable promptness," to investigate the matter and determine the extent of its liability to Dadeland, or to "[d]eny liability in whole or in part and notify [Dadeland], citing reasons therefor." Id. The outstanding issue of fact pertains to whether, and to what extent, St. Paul acted reasonably and in good faith in light of these obligations.

The evidence in the record suggests that Dadeland discovered structural and design defects in connection with the project as early as 1997; Dadeland also discovered that the project, as completed, was in violation of a number of provisions of the South Florida Building Code. Although the facts show that St. Paul was made aware of these problems–and the dispute between Dadeland and the contractor as far as who bore responsibility for them–as early as 1997, the district court found, properly, we believe, that Dadeland did not formally declare a Contractor Default until 14 December 1998. Thus it was not until 14 December that St. Paul's obligations to act under the bond were officially triggered.

In its letter, dated 14 December 1998, Dadeland wrote to St. Paul, declaring that Walbridge had failed to perform the construction contract satisfactorily, and

18

stating that Dadeland was "hereby declar[ing] a Contractor Default and [was] formally terminat[ing] the Contractor's right to complete the contract and/or perform corrective work on the project." R2-71, Exh. 17. In that letter Dadeland demanded that St. Paul "immediately take action in accordance with paragraph 4 of the Bond." Id. The letter also stated: "if the Sureties [did] not take action within five (5) business days of this letter, the Sureties' failure to take action shall be considered a failure to perform 'with reasonable promptness'. . . ." Id. (quotations added).

St. Paul responded to Dadeland on 18 December 1998, and indicated that it was "in the process of conducting an investigation" into Dadeland's allegations. R2-71, Exh. 18. The letter assured Dadeland that St. Paul would follow up with Dadeland on 21 December 1998, but there is no evidence that it did so. Thus, the following day, 22 December 1998, Dadeland again wrote to St. Paul, indicating that St. Paul "[had] not taken action [nor] advised of the action they intend[ed] to take" with respect to Walbridge's default on the project. R2-71, Exh. 19. In addition to demanding that St. Paul take action in accordance with paragraph 4 of the bond, the letter stated that if St. Paul failed to take steps to honor its obligations under the bond within fifteen (15) days of its letter, St. Paul would be deemed in default on

19

the bond, pursuant to paragraph 5.[6] It is clear from the facts that St. Paul did not respond within fifteen days; in fact, its next correspondence with Dadeland did not arrive until 18 January 1999.

In that 18 January 1999 letter, St. Paul took the position that "Walbridge [had] performed as required by the contract documents." R2-71, Exh. 20. In addition, St. Paul stated: "[a]s to any defective work for which Walbridge and the subcontractors may have responsibility, Walbridge has either had the appropriate subcontractors correct the work, or remains willing to have them do so." Id. The letter also stated that Walbridge bore no responsibility for the design defects at the development. Id. Finally, St. Paul stated that it was "not in a position to take over for Walbridge," and thus recommended that Dadeland "cooperate with Walbridge to bring this matter to a final resolution." Id.

A month later, in February 1999, Dadeland filed notice of an insurer violation with the Florida Department of Insurance, alleging that its general contractor had failed to perform the construction contract, that Dadeland had "repeatedly notified [St. Paul] of the problems and declared a contractor default," but that St. Paul,

---

[6] Paragraph 5 of the bond states:
> I]f the Surety does not proceed as provided in Paragraph 4 with reasonable promptness, the Surety shall be deemed to be in default on this Bond fifteen days after receipt of an additional written notice from [Dadeland] to the Surety demanding that the Surety perform its obligations under this Bond, and [Dadeland] shall be entitled to enforce any remedy available to [it].

R2-71, Exh. A at 2.

"without any investigation, refused to perform any of [its] obligations under the Bond." R2-71, Exh. 21. Subsequent correspondence ensued between Dadeland and St. Paul. In July 1999 Dadeland advised that "Walbridge [had] made only a token effort at completing the work under the permit that was issued to them." R2-67, Exh. B at 1. Dadeland's letter again stated that St. Paul had failed to honor its obligations under the bond, and that as a result it was in danger of losing the construction project. The letter listed a panoply of defects contained at the development, and it emphatically demanded St. Paul take steps to address these problems. In response to this letter, St. Paul indicated that the issue of liability for the defects remained an open question, that Walbridge continued to deny responsibility for the defects, and that these issues were being adequately and thorough addressed via the arbitration proceeding between the parties.

Dadeland wrote to St. Paul again in September 1999, stating that its position that it was both irresponsible and inappropriate for St. Paul to rely solely on information obtained from the contractor, Walbridge, thereby intimating that St. Paul was duty-bound to undertake an independent investigation into the defects contained in the development. The letter also made clear that, in light of the fact that Walbridge had allegedly violated both state and county regulations in building the development, at a minimum it was entitled to "at least a portion of [its] claims

21

directly from [St. Paul] at this time." R2-67, Exh. F. In St. Paul's response, the surety indicated that it "strongly disagreed with [Dadeland]'s continued assertions regarding lack of investigation in this matter by [St. Paul]." R2-67, Exh. G. St. Paul stated that had "conduct[ed] a good and proper investigation of [Dadeland]'s allegations," which St. Paul believed were subject to the arbitration.

In a final missive, sent 14 February 2000, Dadeland observed that the contractor had been conclusively found by the Miami-Dade County Board of Rules and Appeals to be in violation of applicable building codes, and that, meanwhile, St. Paul "[had] not provided 1¢ as reimbursement toward the millions of dollars that have been spent correcting clearly deficient work performed by Walbridge." R2-67, Exh. J. The letter accused St. Paul of "sit[ting] idly by and [] ignor[ing] [its] obligations under the performance bond, for which [Dadeland] paid [an] approximately $150,000 premium." Id. Over a year after this correspondence, Dadeland, having in the interim obtained a favorable judgment from the arbitration panel for Walbridge's defective construction, brought the present action against St. Paul, alleging that it acted in bad faith both in delaying the arbitration proceeding and in "totally ignor[ing] their duties under the terms of the performance bond." R2-71, Exh.1 at 4.

In its motion for summary judgment, St. Paul contended that there was no

22

evidence that it breached its obligations under the performance bond, and that therefore it was entitled to summary judgment on Dadeland's bad-faith claim. Specifically, St. Paul argued that paragraph 4 of the performance bond did not obligate St. Paul to correct the construction deficiencies, if, in lieu of doing so, it "[denied] liability in whole or in part" and, "with reasonable promptness under the circumstances," notified Dadeland, "citing reasons therefor." R2-71, Exh. A at 2. St. Paul contended that it had done so, with its response of 18 January 1999–wherein it stated that "Walbridge [had] performed as required by the [construction] contract documents," R2-71, Exh. 20–and that therefore there was no outstanding factual issue as to whether it had acted with bad faith. The district court apparently agreed with this characterization, although it did not make an express finding on the point. In its summary judgment order, the court stated its view that "the sureties performed all that they were required to do under the bond," R3-137 at 25, thereby implying that there were no remaining issues of fact as to whether St. Paul acted with bad faith.

We disagree. Florida's bad-faith statute obligates an insurer[7] to act "in good faith and with due regard for the interests of the insured." Farinas v. Fla. Farm

_____

[7] As an initial matter, as discussed in section A of this opinion, the Florida Supreme Court has clarified unequivocally that a surety such as St. Paul is an "insurer" and that an obligee of a surety contract such as Dadeland is an "insured" for purposes of Fla. Stat. § 624.155. See Dadeland, SC04-1828, slip. op. at 30.

Bureau Gen. Ins. Co., 850 So. 2d 555, 559 (Fla. Dist. Ct. App. 2003), pet. for review denied, 871 So. 2d 872 (Fla. 2004) (citation and internal quotations omitted). See also Fla. Stat. § 624.155(1)(b)(1) (requiring an insurer to act "fairly and honestly toward its insured," and "with due regard for her or his interests"). The statutory provision is grounded in the common law obligation of good faith that was traditionally imposed on insurers, which obligated insurers to "refrain from acting solely on the basis of their own interests" rather than those of the insured party. Farinas, 850 So. 2d 558 (citation and internal quotations omitted). The Florida Supreme Court has held that, at its essence, the duty of good faith requires an insurer to "use the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business." Boston Old Colony Ins. Co. v. Gutierrez, 386 So. 2d 783, 785 (Fla. 1980). Although the typical bad-faith insurance case hinges on an allegation that the insurer breached its contractual duties, the Florida Supreme Court has also stated that "[b]ecause the duty of good faith involves diligence and care in the investigation and evaluation of the claim . . . negligence is relevant to the question of good faith." Id. at 785 (citation omitted).

In Dadeland's case, we find that there remain questions of material fact as to whether St. Paul acted in good faith and with due regard for the interests of its

24

insured, Dadeland, including: (1) whether St. Paul adequately investigated Dadeland's complaints of a default on the part of the contractor; and (2) whether St. Paul adhered to its obligations under the terms of the performance bond. These outstanding fact questions are sufficient for Dadeland to withstand a motion for summary judgment.

As to the first issue, in construing the insurer's duty of good faith in other contexts, the Florida Supreme Court has stated that an insurer has a duty to use "diligence and care in the investigation and evaluation" of an insured's case. Boston Old Colony, 386 So. 2d at 785. See also Farinas, 850 So. 2d at 559 (stating that the insurer "must investigate the facts" underlying a claim in the interests of reaching a final settlement). Here, this duty to investigate the insured's case arises not necessarily by virtue of a contractual provision, but rather by virtue of the insurer's duty of good faith and fair dealing.

We find that there remain issues of material fact as to whether St. Paul conducted a sufficient investigation in response to Dadeland's formal declaration of a default on the part of Walbridge. Dadeland has proffered evidence that St. Paul neither had any direct conversations with Dadeland in response to its Default letter, nor did it hire any consultants, engineers, or experts to determine the responsibilities of the parties with respect to the deficiencies. See R2-67 at 16, 19.

25

Although Dadeland repeatedly protested that St. Paul's denials of liability were based on the self-serving reliances of the contractor–rather than any independent investigation on the part of St. Paul–in response St. Paul stated only that it "strongly disagreed with [Dadeland]'s continued assertions regarding lack of investigation in this matter by [St. Paul]." R2-67, Exh. G. St. Paul never elaborated in the parties' correspondence as to what investigation (if any) it was conducting in connection with the dispute.

In light of this evidence, we agree that factual issues remain as to whether St. Paul acted with good or bad faith, or whether its conduct was reasonable under all of the circumstances. Although the terms of the performance bond may not, by its express terms, have necessarily required St. Paul to conduct an investigation into the defects at the construction site, Dadeland's proffered evidence–which suggests a failure on the part of St. Paul to conduct a thorough investigation into the contractor's default– is sufficient to give rise to fact questions as to whether St. Paul acted reasonably, with due care, and with regard to the interests of its insured, Dadeland.

Second, the evidence raises questions of fact as to whether St. Paul did in fact adhere to its obligations under the bond. Specifically, the evidence suggests that St. Paul failed to act in a timely manner with respect to Dadeland's allegation of a

26

Contractor Default, as it was required to do. Under the terms of the bond, after being initially advised of Walbridge's default, St. Paul was obligated either to commence rectifying the matter, or, with "reasonable promptness," to: (1) determine the amount for which it was liable; or (2) "[d]eny liability in whole or in part" and notify Dadeland of same. R2-71, Exh. A at 2. After being advised of Walbridge's default on 14 December 1998–and being asked to honor its obligations under the bond within five (5) days–St. Paul failed to take any of these steps. Rather, on 18 December 1998 it responded and stated only that it was "in the process of conducting an investigation" into the dispute. R2-71, Exh. 18. Its formal denial of liability pursuant to paragraph 4.4 did not come until a month later, on 18 January 1999–thereby raising a jury question as to whether St. Paul acted with "reasonable promptness,"[8] as it was required to do.

Additionally, the evidence suggests that St. Paul did not adhere to paragraph 5 of the bond, which obligated St. Paul to act within fifteen days of receiving an additional written demand from Dadeland, or to be deemed in default of its commitments. The record established that St. Paul failed to do so; Dadeland served its additional written letter on St. Paul on 22 December 1998, demanding that St. Paul honor its obligations under the bond, but St. Paul's response (in which it

---

[8] We disagree with the district court's finding that the evidence established that St. Paul acted "with reasonable promptness." R3-137 at 25.

finally invoked its right to deny liability under paragraph 4.4) did not arrive until 18 January 1999–plainly beyond the fifteen-day period required by the bond's terms.[9] Not only does this evidence suggest that St. Paul's belated response arguably placed it in default of its commitments under the bond, but, viewed in context with all of the factual circumstances, it creates triable issues of material fact as to whether St. Paul acted in a timely manner and with reasonable care towards its insured, Dadeland, or whether it engaged in a concerted attempt to avoid its commitments under the bond by engaging in bad-faith dilatory tactics.

Viewed in a light most favorable to Dadeland, the nonmoving party, and resolving all reasonable doubts in its favor, see Johnson, 263 F.3d at 1242, we find there are outstanding fact issues as to whether St. Paul acted in good faith and in accordance the terms of bond, or whether its conduct constituted an effort to engage in a pattern of bad-faith delay and denial. Accordingly, the district court's summary judgment in favor of St. Paul was improper. See, e.g., Berges v. Infinity Ins. Co., 896 So. 2d 665, 680 (Fla. 2004) ("[W]here material issues of fact which would support a jury finding of bad faith remain in dispute, summary judgment is

___

[9] Under paragraph 5 of the bond, and based on the receipt of Dadeland's letter, St. Paul was obligated to respond to Dadeland within fifteen days of 22 December 1998. Taken literally, the language of paragraph 5 obligated St. Paul to respond by 6 January 1999. Even reading paragraph 5 more liberally, as referring only to *business* days– and not counting business holidays for Christmas and New Year's Day– St. Paul would still have been obligated to respond by 14 January 1999. As its response did not arrive until 18 January 1999, under any calculation it seems clear that St. Paul failed to adhere to the requirements of the bond.

28

improper.").[10]  Because "[t]he evidence presents a sufficient disagreement" on the question of St. Paul's conduct and whether it constituted bad faith, and because it is not "so one-sided that one party must prevail as a matter of law," Jeffery, 64 F.3d at 594 (citation and internal quotations omitted), we conclude that it would be inappropriate to grant summary judgment for St. Paul on the question of whether it acted with good or bad faith in handling the dispute between Dadeland, St. Paul, and Walbridge.[11]

B.  District Court's Denial of Partial Summary Judgment to Dadeland

---

[10] Our conclusion is bolstered by the fact that Florida courts have repeatedly held that "[t]he question of failure to act in good faith with due regard for the interests of the insured is for the jury."  Boston Old Colony, 386 So. 2d at 785 (citation omitted).  See also Berges, 896 So. 2d at 680 ("Each case is determined on its own facts and ordinarily the question of failure to act in good faith with due regard for the interests of the insured is for the jury.") (citation, internal quotations and alterations omitted); Vest, 753 So. 2d at 1275 ("Good-faith or bad-faith decisions depend upon various circumstances and usually are issues of fact to be determined by a fact-finder."); Farinas, 850 So. 2d at 559 (stating that "the jury is to decide whether an insurer has given inappropriate primary regard to his own interests over those of the insured").

Moreover, although the Florida Supreme Court did not address the substantive merits of Dadeland's bad-faith claim in its decision, it suggested in dicta its apparent belief that Dadeland had raised genuine issues of material fact and that therefore it ought to be entitled to proceed to trial.  See, e.g., Dadeland, SC04-1828, slip. op. at 10 ("[W]hether Dadeland is entitled to an award for bad faith damages resulting from a failure to act in good faith under the bond beyond any contractual amounts owed *can only be properly determined as this case proceeds to trial* and Dadeland is afforded the opportunity to develop and prove damages, if any, suffered as a result of the alleged bad faith conduct of St. Paul.") (emphasis added); id. at 11 (stating that Dadeland will be precluded from obtaining duplicative damages at trial); id. at 42 (discussing the defenses that St. Paul will be permitted to raise at trial).

[11] On appeal, the parties did not argue as to the merits of Dadeland's allegations of unfair trade practices–which it brought in connection with its § 624.155 action–and, therefore, we do not address that issue.

Dadeland also challenges the district court's denial of partial summary judgment on the issue of whether St. Paul should be collaterally estopped from re-raising the same defenses that it raised in the arbitration action. In the arbitration, St. Paul raised two relevant defenses: first, that Dadeland failed to comply with the terms of the performance bond, in that it did not give proper notice to St. Paul; and second, that St. Paul was discharged from liability under the bond to the extent Dadeland had made payments to Walbridge for the work performed. The arbitration panel, which awarded Dadeland damages for the construction defects, expressly stated in its decision that St. Paul was "bound to this award" and that *"its defenses [were] denied."* R2-71, Exh. 23 at 5 (emphasis added). Dadeland's motion for partial summary judgment argued that, in rejecting St. Paul's defenses, the arbitration panel had fully disposed of them, and that St. Paul should be collaterally estopped from re-raising them in the current proceeding. In response to Dadeland's collateral estoppel argument, St. Paul argued that Dadeland's bad-faith refusal-to-settle claim was separate and distinct from the breach of contract claim that had been at issue in the arbitration, and that therefore collateral estoppel did not apply.

The district court was unclear as to whether the arbitration panel's decision–which the court viewed as akin to a breach of contract dispute–would have the

30

effect of collaterally estopping St. Paul from raising the same defenses in a subsequent bad-faith refusal-to-settle action. The court concluded that the issue was largely moot, however, based on its earlier determination that res judicata barred Dadeland's action in its entirety. Accordingly, the court denied Dadeland's motion for partial summary judgment.

On appeal, we concluded that it was uncertain whether an arbitrator's disposition of a party's defenses in a breach of contract action would subsequently bar that party from raising them again in a separate bad-faith refusal-to-settle action, brought under § 624.155. Thus we certified this question to the Florida Supreme Court:

> WILL AN ARBITRATOR'S DENIAL OF THE DEFENDANT'S AFFIRMATIVE DEFENSES IN A BREACH OF CONTRACT CLAIM COLLATERALLY ESTOP THE SAME DEFENDANTS FROM RAISING THE SAME DEFENSES IN A SUBSEQUENT BAD-FAITH REFUSAL-TO-SETTLE CLAIM AGAINST THE SAME PLAINTIFF?

Dadeland, 383 F.3d at 1279.

The Florida Supreme Court's response was two-fold. First, the court concluded that the merits of St. Paul's two defenses had been fully considered and rejected by the arbitration panel, and that, consequently, it was now precluded from reasserting those defenses in its action against Dadeland. Thus, the court agreed with Dadeland that collateral estoppel precluded St. Paul from re-raising the same

31

defenses that it raised in the arbitration proceeding.

Second, however, the court indicated that St. Paul was *not* precluded from demonstrating the *factual basis* for its belief that the defenses it raised in the arbitration proceeding were valid. The court observed that St. Paul could seek to defend against the current bad faith claim by arguing that it "reasonably and in good faith believed that the previously rejected affirmative defenses were valid" at the time it raised them in the arbitration, Dadeland, SC04-1828, slip. op. at 42, and that the factual basis for that belief, if reasonable, could feasibly assist St. Paul in defending against Dadeland's current § 624.155(1)(b)(1) action.[12] Thus, while St. Paul could not re-raise the same defenses in the current action, the court stated that St. Paul could seek to show a factual basis as to why it believed those defenses were reasonable, so as to undermine Dadeland's contention that it had engaged in a bad-faith refusal-to-settle.

Having received the response of the Florida Supreme Court, however, it is clear that St. Paul is collaterally estopped from raising against Dadeland the same defenses that were raised and rejected in the earlier arbitration proceeding. Because

---

[12] The court stated that "it is necessary for a court faced with a section 624.155 action to consider the entirety of the factual scenario underlying the plaintiff's claim when determining whether the defendant-insurer acted in bad faith . . . . In the instant matter, this factual scenario would necessarily include a review of whether St. Paul reasonably believed that its affirmative defenses were valid, thereby excusing it from performing its obligations under the performance bond." Dadeland, No. SC04-1828, slip. op. at 42.

collateral estoppel applies to those defenses, the district court should have granted

partial summary judgment for Dadeland on that issue.  Its failure to grant partial

summary judgment on this question was in error.

C.  Dadeland Motion for Attorneys' Fees

As a final matter, in connection with this appeal, Dadeland filed a separate

motion for attorneys' fees pursuant to Fla. Stat. § 627.428.[13]  As St. Paul correctly

notes, an award of attorneys' fees under this statute is permissible only upon the

insured's obtaining a final judgment or decree in "which [] recovery is had."  Id.

See also Duke v. Hoch, 475 F.2d 761 (5th Cir. 1972) (stating that attorney's fees

may be granted under Fla. Stat. § 627.428 "should the appellant ultimately prevail,"

and stating that "prevail[ing] in the statutory sense" includes a "final judgment

entered for appellant") (internal citation, alteration, and quotations omitted).  Here,

although Dadeland has prevailed in the instant appeal, it has not yet obtained a

recovery pursuant to a final judgment in the district court.  Therefore, an award of

attorneys' fees for costs of this appeal would be premature at this juncture.

The Florida Supreme Court conditionally granted Dadeland's motion for

---

[13] That provision states: "Upon the rendition of a judgment or decree by any of the courts of this state against an insurer and in favor of any named or omnibus insured or the named beneficiary under a policy or contract executed by the insurer, the trial court or, in the event of an appeal in which the insured or the named beneficiary prevails, the appellate court shall adjudge or decree against the insurer and in favor of the insured or beneficiary a reasonable sum as fees or compensation for the insured's or beneficiary's attorney prosecuting the suit in which the recovery is had."  Fla. Stat. § 627.428.

attorneys' fees. We likewise conditionally grant Dadeland's motion for attorneys' fees incident to this appeal, conditioned upon Dadeland's ultimate recovery in the district court. See McDonald, 373 So.2d 94.

## III. CONCLUSION

Dadeland appealed the district court's grant of summary judgment in favor of St. Paul, contending that the district court erred (1) in holding that Dadeland had not satisfied the condition precedent necessary to bring a § 624.155 claim against St. Paul, in that it had not demonstrated the validity of its underlying claim; (2) in holding that Dadeland's claims were barred by res judicata; and (3) in holding that Dadeland was required to allege a general business practice in order to bring an unfair trade count under § 624.155(1)(a)(1). Because each of the district court's conclusions was inconsistent with the answers that we received from the Florida Supreme Court, we conclude that the district court erred in granting summary judgment as a matter of law to St. Paul. Moreover, we conclude that summary judgment in favor of St. Paul would be inappropriate, given that genuine issues of material fact remain outstanding in this case.

In addition, Dadeland appealed the denial of his motion for partial summary judgment, contending that St. Paul should be collaterally estopped from re-raising defenses that were rejected in the prior arbitration proceeding. The Florida

34

Supreme Court has responded to our certified question on this issue by holding that collateral estoppel clearly does apply to the defenses St. Paul raised in the earlier arbitration proceeding. Consequently, the district court erred in denying partial summary judgment to Dadeland on this issue.

Accordingly, we **REVERSE** the district court's grant of summary judgment in favor of St. Paul, **GRANT** Dadeland's motion for partial summary judgment, and **REMAND** for further proceedings consistent with this opinion. We conditionally **GRANT** Dadeland's motion for attorneys' fees incident to this appeal, conditioned on its ultimately obtaining a favorable judgment in the district court.