APPEL, Justice
(dissenting).
I respectfully dissent. As will be seen below, I view the case differently than the majority. I. would reverse ,the decision of the district court and allow the insured’s bad-faith claim to proceed to trial.
I.' Background Facts and Proceedings.
,. The majority’s overview of the facts and proceedings does not present the entire picture. After the insurance company paid $108,310.on the claim but refused to pay more, the insured filed a breach-of-contract action. The factual questions in the breach-of-contract action were simple: what was the value of the insured’s property destroyed by fire and did the value exceed the amount that the insurance company had previously paid? A jury answered the question in the affirmative and awarded the insured a verdict of $236,901.52.
. At trial for the contract claim, the insurance adjuster responsible for the insured’s claim testified she had no idea what the actual value of the property was. This is extraordinary trial testimony: an adjuster *732 acting on behalf of the insurer, who had the responsibility' to evaluate and fairly pay claims, had no idea what the value of the destroyed property was. This was powerful evidence that could be mar-shalled in support of a bad-faith claim.
After obtaining a verdict in the first trial, the insured then filed its bad-faith claim. Extensive discovery followed, including discovery of the insurer’s claims file and deposition of the insurer’s claims attorney and the insurer’s claims supervisor. The contested factual issues in the bad-faith case were materially different from the underlying contract action. In the bad-faith action, the contested factual issues focused on the manner in which the insurer handled the insured’s claim.
Given the different nature of the factual issues in the bad-faith action, the potential scope of discovery was different, and certainly much broader, than in the contract action in which the only contested factual issues related to the value of the destroyed property. The insured took advantage of the broader discovery opportunity, deposing the lawyer who represented the insurance company in the original breach-of-contract action and obtaining through extensive discovery claim files and various correspondences between the insurance company and its counsel. Compare Handley v. Farm Bureau Mut. Ins. Co., 467 N.W.2d 247, 250 (Iowa 1991) (holding discovery of insurance claim file allowed in bad-faith ’ action), with Johnson v. State Farm Auto. Ins. Co., 504 N.W.2d 135, 137 (Iowa Ct.App.1993) (noting investigation file was not subject to discovery in uninsured portion of suit which had been severed from bad-faith claim).
After discovery, the insured developed a bad-faith case supported by substantial evidence. The plaintiffs produced substantial evidence to show that the claims adjuster on the file knew that the value of the claim was in excess of what the insurer had paid but nonetheless repeatedly refused to approve additional payments and that, although the hiring of an appraiser was authorized to value the property destroyed, none was ever hired.
The insurer moved for summary judgment. The district court granted the motion on the ground that the insured was precluded by principles of res judicata because of the insured’s failure to bring the claim in -the original action. The insured appealed. We transferred the case to the court of appeals. A majority of the court of appeals found that under applicable Iowa law, the insured was not precluded from bringing a separate bad-faith claim. We granted further review.
II. Discussion.
A. Overview of Iowa Law.
1. Introduction. The proper scope of the doctrine of res judicata has been a traditional source of controversy in American law. At the risk of oversimplification, the dispute has centered on broad or narrow application of the doctrine. See Edward W. Clearly, Res Judicata Reexamined, 57 Yale L.J. 339, 339-42 (1948) (discussing the differences between the traditional narrower view and the broader transactional approach). The general question in the debate is how broadly a “claim” or “cause of action” should be defined. Id. at 340-41.
As a general matter, the law has shown an ambivalence toward the doctrine. As noted by the leading historic advocate of the broad transactional approach to res judicata, Judge Clarke, in ■ a' dissenting opinion before the adoption of the Restatement (Second) of Judgments, “The defense of res judicata is universally respected, but actually not very well liked.” Riordan v. *733 Ferguson, 147 F.2d 983, 988 (2d Cir.1945) (Clarke, J., dissenting).
We have historically adopted a fairly narrow view of the doctrine of res judicata. As is illustrated in the majority opinion of the court of appeals, there are several Iowa precedents that have a bearing on the res judicata issue presented in this case. The majority opinion of the court of appeals well plowed much of the legal ground, but there are several points worth emphasis. First, there is a clear difference between what must be proven to support a claim of breach of contract and a bad-faith claim. Second, our caselaw has emphasized the difference between an identical or “same claim,” a “related claim,” and a claim that is not based upon “the same evidence.”
2. Difference between breach-of-contract and first-party bad-faith claim. This case involves a first-party insurance bad-faith claim. A first-party claim involves an insured’s attempt to recover against his or her own insurance company. First-party claims were first recognized in Gruenberg v. Aetna Insurance Co., when the California Supreme Court emphasized that the duty of good faith is independent of the insured’s contractual obligation. 9 Cal.3d 566, 108 Cal.Rptr. 480, 510 P.2d 1032, 1040 (1973) (en banc). The Gruen-berg court also held that a first-party bad-faith plaintiff may recover for emotional distress without a showing of extreme and outrageous conduct ordinarily associated with the common law tort of intentional infliction of emotional distress. Id., 108 Cal.Rptr. 480, 510 P.2d at 1041. Because the relationship between the insured and the insurer implicated the public interest, the California Supreme Court has held that punitive damages would be available in bad-faith tort situations. Egan v. Mut. of Omaha Ins. Co., 24 Cal.3d 809, 169 Cal.Rptr. 691, 620 P.2d 141, 146 (1979) (en banc).
We first recognized such a claim in Dolan v. Aid Insurance Co., 431 N.W.2d 790, 794 (Iowa 1988), We noted the rationale in Gruenberg and other cases for the bad-faith tort: that arbitrary coverage denial and delay of payment must be addressed, that physical injury and economic loss may occur when bargaining with the insurance company, and that the relationship between an insurer and insured is imbued with the public interest. Id. at 791-92 (citing Mary Elizabeth Phelan, The First Party Dilemma: Bad Faith or Bad Business?, 34 Drake L. Rev. 1031, 1035-36 (1985)); see also id. at 791 n. 1. We specifically noted that traditional contract remedies would not compensate an insured for the harms arising from bad-faith conduct and that the unequal. bargaining power between the insured — who has .sustained a loss and sought coverage — and the insurer requires redress. Id. at 794.
As this case well illustrates, there are important differences between a breach-of-contract claim and a first-party bad-faith claim. A breach-of-eontract claim is based upon the contractual terms and enforces the expectations of .the parties. See Magnusson Agency v. Pub. Entity Nat’l Co.-Midwest, 560 N.W.2d 20, 25, 27 (Iowa 1997),. In-this case, the breach-of-eontract claim inyolved a contest over the value of the destroyed property.
But a bad-faith claim is a different animal.- Bad faith involves “the -knowing failure to exercise an honest and informed judgment.” Kiner v. Reliance Ins. Co., 463 N.W.2d 9, 12 (Iowa 1990) (quoting Anderson v. Cont’l Ins. Co., 85 Wis.2d 675, 271 N.W.2d 368, 377 (1978)). As is apparent, “[t]he fact that the insurer’s position is ultimately found to lack merit is not sufficient by itself to establish-the first element of a bad faith claim.” Bellville v. Farm *734 Bureau Mut. Ins. Co., 702 N.W.2d 468, 473 (Iowa 2006). The factual basis and the evidence required to support a first-party bad-faith claim is thus materially different from the evidence required to support a breach-of-contract claim.
Because of the factual differences in .the claims, discovery is also different. In a contract claim, discovery is limited to the factual questions related to the question of breach of contract. On the other hand, in a bad-faith claim, broader discovery, including discovery of the claim file, is ah lowed. A bad-faith claim can also give rise to difficult discovery disputes regarding the scope of attorney-client and work-product privileges. See generally Handley, 467 N.W.2d at 260; Johnson, 504 N.W.2d at 137.
Not only do the factual requirements of a bad-faith claim 'differ from a breach-of-contract claim, the remedies aré different toó. The breach-of-'contract 'claim entitles a plaintiff to recover the benefit-of-the-bargain damages. A,bad-faith claim, however, is a tort. Among other things, compensatory, emotional distress, and punitive damages are available against the insurance company. Dolan, 431 N.W.2d at. 794.
The factual requirements' and available remedies are different because' the claims protect different interests.' A contract claim protects the insured’s economic interests. See Richards v. Midland Brick Sales Co., 551 N.W.2d 649, 650-51 (Iowa Ct.App.1996). The tort of bad faith protects the dignity and emotional interests of the insured and fosters the public policy of not allowing insurers to use their' superior position to the disadvantage of their insureds. See Egan, 169 Cal.Rptr. 691, 620 P.2d at 146; Travelers Ins. Co. v. Savio, 706 P.2d 1258, 1273 (Colo.1985) (en banc); Grand Sheet Metal Prods. Co. v. Protection Mut. Ins. Co., 34 Conn.Supp. 46, 375 A.2d 428, 430 (1977).
Experienced plaintiffs and defense counsel recognize that the stakes in a potential bad-faith claim are typically much higher than in an ordinary contract action. Contract claims arise in the ordinary course of the insurance business and are often defended on a win-some/lose-some, cost-of-doing business basis. Bad-faith ' claims, however, put at risk a dramatically greater financial and reputational interest of the insurer and its employees. As a result, bad-faith claims often give rise to a much more vigorous, resource-intensive defense than an ordinary contract action, often involving the retention of experienced outside counsel to defend the bad-faith action. As observed by one leading commentator, high stakes bad-faith disputes “tend to bring out the participants’ meaner sides.” Stephen S. Ashley, Bad Faith Actions Liability & Damages § 10:1 (2d ed.1997) [hereinafter Ashley].
3. “Same-claim” and “same-evidence” criteria distinguish identical claims from related claims. We have considered in our caselaw the difference between an identical claim and.a related claim. Our cases indicate that, an “identical claim” must be brought in the first action and will be barred by the doctrine of res judicata if it is not. joined with the original action. When a “related claim” is involved, however, the plaintiff has the option of bringing the claim in the original proceeding or bringing a separate action on the related claim. ’ .
A key issue in our caselaw is distinguishing between an identical claim and a related claim. As will be seen below, our cases tend to emphasize that the claims must utilize the “same evidence” and involve the “same claim” in order to be considered “identical.” By distinguishing between identical claims and related claims, and by basing the distinction at least in part on a “same-claim” and a “same-evidence” test, *735 our law tends to depart from the broad transactional approach to res judicata often employed in federal caselaw. The distinction between the same-evidence approach and the transactional test has been recognized by a leading commentator. See Robert Kelly, Post-Trial Issues in 12 New Appleman on Insurance Law Library Edition § 156.09[l][a], at 156-51 (Jeffrey E. Thomas, Laura A. Foggan, & Lorelie Si Masters eds., 2015).
We begin our discussion of Iowa law with B & B Asphalt Co. v. T.S. McShane Co., 242 N.W.2d 279 (Iowa 1976). .In this case, the plaintiff.first filed a fraud action against the defendant. Id. at 281. After failing in the first-action, the plaintiff brought a second action based upon the same facts alleging breach of express and implied warranties and. negligence. Id. We held the second action was barred by res judicata. Id. at 287. We noted, “Our cases say identity of cause of action is established when the same evidence will maintain both actions.” Id. (emphasis added). The same-evidence approach in B & B Asphalt was firmly rooted in existing Iowa caselaw. See Young v. O’Keefe, 248 Iowa 751, 756, 82 N.W.2d 111, 114 (1957) (noting the test is “to inquire if the same evidence will maintain both the present and the former action” (quoting Band v. Reinke, 230 Iowa 515, 520, 298 N.W. 865, 868 (1941))); Woodward v. Jackson, 85 Iowa 432, 435, 52 N.W. 358, 359 (1892). In B & B Asphalt, we applied our traditional same-evidence principle in the O’Keefe/ Band/Woodward line of cases and held that the same evidence supported both the first and second actions, and as a result, Iowa principles of res judicata barred the second claim. 242 N.W.2d at 287.
Another case illustrating important Iowa principles of res judicata is Westway Trading Corp. v. River Terminal Corp., 314 N.W.2d 398 (Iowa 1982). In this case, the central issue was the interesting question of whether a party may bring separate actions claiming breach of different provisions of a single lease. Id. at 401. Citing B & B Asphalt with approval, we stated that in determining whether a separate action was present, we consider “the protected right, the alleged wrong, and the relevant evidence.” Id. (citing B & B Asphalt, 242 N.W.2d at 286). Under the facts presented in the case, we held that res judicata did not apply. Id. We noted that the alleged right, the alleged wrong, and the relevant evidence were different from claims in' an earlier action involving the same contract. Id. We further emphasized, however, that the mere fact a plaintiff could have brought the claims' in one action did not bar the bringing of successive actions. Id. at 401-02.
Another case closer to the subject matter of this case is Leuchtenmacher v. Farm Bureau Mutual Insurance Co., 460 N.W.2d 858 (Iowa 1990). There, the insured estate sought to bring a bad-faith claim against an insurer after a prior successful action on an uninsured motorist policy. Id. at 859. We cited favorably B & B Asphalt and noted that the question was whether the first and second causes of action amounted to the “same claim.” : Id. at 860. We noted that “a second claim is likely to be considered precluded if the acts complained of, and the recovery demanded, are the same.” /(¿..(citing B & B Asphalt Co., 242 N.W.2d at 286). While we did not depart from our same-evidence precedents, we recited the elastic phrases of the Restatement (Second) of Judgments, which state that in determining whether causes of action arose from the same transaction, the inquiry turns on whether there is “a natural grouping or common nucleus of operative facts” and involves “a determination whether the facts are so woven- together as to constitute a single claim.” Id. (quoting Restate *736 ment (Second) of Judgments § 24 cmt. 6 (1982) [hereinafter Restatement (Second)]).
In Leucktenmacher, the insurer filed a motion to dismiss the claim, arguing that because the bad-faith action could have been brought in the first action, the claim was barred as a matter of law. Id. at 859. The Leucktenmacher court declined to so rule. Instead, the court held that whether the claim was precluded “depends on whether the cases arose out of the same facts.” Id. at 861. The Leucktenmacher court gave an example: “In fact, a bad-faith claim might well be based on events subsequent to the filing of the suit on a policy and therefore could not be based on the ‘same’ facts.” Id. We concluded, however, by emphasizing that whether the claims were precluded depended, upon the general principle of whether they arose out of the “same facts.” Id.
An additional illustrative Iowa case is Iowa Coal Mining Co. v. Monroe County, 555 N.W.2d 418 (Iowa 1996). The case involved a classic ongoing regulatory battle royal between an economically distressed Iowa Coal and Monroe County. Id. at 424-26. In the first action, Iowa Coal challenged the validity of a zoning ordinance that limited its operations in the county on a number of constitutional grounds. Id. at 425-26. Iowa Coal did not prevail. Id.
Monroe County then passed a new but almost identical zoning ordinance. Id. at 426. Not to be outdone, Iowa Coal launched another action. Id. In the second action, Iowa Coal brought a claim for tortious interference in addition to renewing its constitutional claims made in the previous action. Id,
In Iowa Coal, Monroe County argued that the tortious interference claim could have been brought in the original action and therefore was barred under res judica-ta. Id. at 427. We rejected the assertion. We recognized that there was evidence in the first action from which the district court could have found intentional interference. Id. at 443. Although there was some overlap of evidence, this was not determinative. Id. at 443-44. We observed that evidence in support of the tortious interference claim was different from the evidence to support the constitutional claims in the first action. Id at 444. Among other things, we noted that under the tortious interference claim, Iowa Coal “had to prove the County’s motive in its interference was to financially injure or destroy Iowa Coal” while this showing was not required under the claims brought in the original action. Id. We further noted that the fact the tortious interference claim might have been litigated in the original action was of no consequence. Id.
Finally, in Arnevik v. University of Minnesota Board of Regents, we reprised the contours of Iowa res judicata principles. 642 N.W.2d 315 (Iowa 2002). Among other things, we noted that claim preclusion is likely “where the ‘acts complained of, and the recovery demanded are the same or where the same evidence will support both actions.’ ” Id. at 319 (emphasis added) (quoting Whalen v. Connelly, 621 N.W.2d 681, 685 (Iowa 2000)). Additionally, we have noted that the first and second action must be functionally the same but for the creative stylings of counsel. See Pavone v. Kirke, 807 N.W.2d 828, 837 (Iowa 2011) (noting that we “carefully distinguish” between the same cause of action and related causes of action); Whalen, 621 N.W.2d at 685. The above solid and unwavering line of authority was relied upon by the court of appeals in holding that the bad-faith claim in this case did not need to be joined with the original *737 contract claim.[8]
B. Application of Iowa Law. In my view, application of the same-claim, same-evidence principles embraced in the above quintet of Iowa cases supports the position of the insured and does not allow application of res judicata in this case. Further, the mere fact the bad-faith claim could have been brought earlier clearly is not determinative. See, e.g., Westway, 314 N.W.2d at 401-02.
It seems clear to me that, as in Iowa Coal, the evidence in a bad-faith tort action is materially different from a contract action on the insurance policy. A breach of contract, of course, may be present without a valid bad-faith claim. See Bellville, 702 N.W.2d at 473. Evidence in the breach-of-contract claim in this case was quite narrow and focused entirely on the value of the destroyed property. And when the claim is so limited, discovery is correspondingly limited.
The nature of the bad-faith claim in this case, however, reaches into the manner in which the claim was handled. The evidence to support the bad-faith claim is not the same as the evidence to support the breach-of-contract claim. A bad-faith claim can be proven only by showing exactly how the- company processed the claim, how thoroughly the claim was considered, and why the company took the action it did. See Brown v. Superior Ct., 137 Ariz. 327, 670 P.2d 725, 734 (1983) (en banc). The subjective state of mind of claim handlers is critical. See Kiner, 463 N.W.2d at 12-13. Who at the .insurance company knew what, when they knew it, and other factual questions totally foreign to the contract dispute are the guts of the bad-faith action. That is why our caselaw allows risk-management experts to'testify in bad-faith cases about the proper risk management of a claim after the loss has occurred, an issue distinct from the question of whether the contract was breached in the first instance. Nassen v. Nat’l States Ins. Co., 494 N.W.2d 231, 235-36 (Iowa 1992). As noted in one recent case, “Insurance bad faith cases are won or lost on the contents of the insurer’s claims files.” State Farm Mut. Auto. Ins. Co. v. Howard, 296 F.R.D. 692, 695 (S.D.Ga.2013) (quoting Ashley at § 10:28). The claims file, however, generally has little to do with a breach-of-contract claim.
Thus, under the same-claim, same-evidence approach emphasized in B & B Asphalt and its progeny through Amevik, res judicata does not apply. The evidence needed to support, a bad-faith claim goes well beyond that which would ordinarily support a simple breach-of-contract claim. This case presents a classic example of the different nature of the contract and bad-faith causes of action. (The contract action focused solely on property values. The bad-faith action will focus on the postloss behavior of the insurance company in handling the claim, which was completely irrelevant in the first action.
Further, related but separate rights are involved in the two claims. The insurance company has a contractual duty to honor its contract, but it has a separate duty in *738 tort to deal with its insured in good faith. The focus of the tort is not whether a specific contractual provision has been breached, but whether the insurer’s “conduct [has damaged] the very protection or security which the insured sought to gain by buying insurance” through its handling of the claim. Rawlings v. Apodaca, 151 Ariz. 149, 726 P.2d 565, 573 (1986) (en banc).
The remedies are also distinct. The recovery is not limited to the benefit of'the bargain. Instead, remedies include consequential damages, emotional distress damages, and punitive damages. Dolan, 431 N.W.2d at 794. The harm compensated by an award of emotional distress damages is different from the economic harm protected in the contract claim and, of course, requires different proof. Further, punitive damages are available in part to support public policies inherent in the contract of insurance. The differences in rémédies demonstrate that different rights and wrongs are being addressed in contract actions compared to bad-faith actions.
Nothing in Leuchtenmacher is to the contrary. Leuchtenmacher emphasized that a motion to dismiss did not lie when an insured who had successfully litigated a contract claim against the insurer brought a separate bad-faith action. 460 N.W.2d at 861. Leuchtenmacher emphasized the traditional themes of identity of claim and same evidence. Id. at 860. While Leu-chtenmacher did state that “a bad-faith claim might well be based on events subsequent to the filing of the suit on a policy and therefore could not be based on the ‘same’ facts,” such language does not limit the situations in which a contract claim and a bad-faith claim are not “based on the same facts.” Id. at 861. It only provides an obvious example of how the facts in a bad-faith claim might be different from a contract claim. Id.
The insurer also carries Restatement (Second), section 24 as a head on a pike in support of its claim. The Restatement emphasizes that its terms are “not capable of a mathematically pre'cise definition” and notes that determining whether to apply res judicata requires a “delicate balance” between the rights of both the insurer and the insured. Restatement (Second), § 24 cmt. b. The language of this Restatement provision is elastic, and in any event, if it is to be applied, it must be read in a manner consistent with the woof and weave of Iowa same-claim, same-evidence caselaw. To the extent the Restatement is inconsistent with our prior caselaw, I would not .follow it. _
I acknowledge, of course, that there is authority from other jurisdictions that embraces a broad transactional theory of res judicata. The majority opinion has a fistful of them. Although they could be serially picked apart, a general observation will do. As a rule, the cases cited by the majority glide over any same-evidence or same-claim considerations in favor of a broader transactional approach. They also contain a whiff of hostility to firsb-party bad-faith claims by minimizing the differences between a bad-faith and a contract claim. -
A good example of this gliding and minimizing with a whiff of hostility is Porn v. National Grange Mutual Insurance Co., 93 F.3d 31 (1st Cir.1996). Remarkably, Pom does not grasp the difference between an identical claim and a related claim emphasized in the Iowa cases. See Iowa Coal, 555 N.W.2d at 442 (citing in support Westway, 314 N.W.2d at 401, and Leuchtenmacher, 460 N.W.2d at 860). Further, Pom minimizes the factual differences between a bad-faith and a contract .claim, suggesting that the claims involve only “different -shadings of the facts.” Porn, 93 F.3d at 35. In this case, the *739 differences in the claims do not involve “different shadings of the facts,” but a materially different discovery, evidentiary, and remedial regime. In Pom, the court plays the res judicata symphony in the transactional key of B flat minor, while in our Iowa cases, the res judicata symphony is played in the same-evidence, same-claim key of A major. In short, they have some similarities but do not. sound very much alike.
Although the majority suggests that a “great majority” of cases supports its view, a more objective observation is made by a leading commentator, who indicates that “[tjhe courts are divided on the issue.” Ashley at § 7:11.- If we are enlisting cases to serve as penguins marching to the sea, there are conscripts that support the traditional Iowa position as well as the majority viewpoint. See Dadeland Depot, Inc. v. St. Paul Fire & Marine Ins. Co., 483 F.3d 1265, 1271-72 (11th Cir.2007) (holding insured not barred from separate bad-faith action even though insured could have brought claim in earlier arbitration proceeding); Schmueser v. Burkburnett Bank, 937 F.2d 1025, 1031 (5th Cir.1991) (noting that under Texas law,- bad-faith claim against bank requires different proof than earlier action, seeks a different measure of recovery, and is thus not barred by prior declaratory action); Corral v. State Farm Mut. Auto. Ins. Co., 92 Cal.App.3d 1004, 155 Cal.Rptr. 342, 345 (1979) (contrasting bad-faith claim with contract claim under auto insurance policy); Cantrelle Fence & Supply Co. v. Allstate Ins. Co., 515 So.2d 1074, 1079 (La.1987), superseded by statute, Act of July 18, 1990, No. 521, §§ 1-2, 1990 La. Sess. Law Serv. 521, 521; Slider v. State Farm Mut. Auto. Ins. Co., 210 W.Va. 476, 557 S.E.2d 883, 890 (2001) (finding bad-faith claim not precluded by res judicata because different evidence required).
Further, decisions embracing a same-evidence approach to res judicata rather than a broad transactional test are well represented in the easelaw. See, e.g., Butts v. Evangelical Lutheran Good Sarmaritan Soc., 852 F.Supp.2d 1139, 1145 (D.S.D.2012); Lemuel v. Admiral Ins. Co., 414 F.Supp.2d 1037, 1061 (M.D.Ala.2006); SMA Servs., Inc. v. Weaver, 632 N.W.2d 770, 774 (Minn.Ct.App.2001). But see Mortient Corp. v. Dondero, 269 S.W.3d 78, 85 (Tex.Ct.App.2008) (noting Fifth Circuit’s transactional test does not consider variations in the evidence).
In any event, easelaw, counted on an abacus does not provide a rule of decision or provide a basis for the obvious innovations of our prior easelaw presented in the court’s opinion in this case. See Handeland v. Brown, 216 N.W.2d 574, 577 (Iowa 1974) (K[W]e have no obligation to adopt a rule just because it has generally been adopted elsewhere. Although cases from other states may be persuasive authority, they have no greater cogency than the reasoning by which they were decided.”). The court of appeals correctly applied our easelaw when it declared, “[Bjecause the protected right, the alleged wrong, the recovery sought, and the relevant evidence in the current tort lawsuit are different than in the prior contract lawsuit, claim preclusion does not apply to bar the plaintiffs tort claim.” Rather than depart from our unwavering same-claim, same-evidence easelaw, I would hold the course.
C, Pragmatic Considerations. The majority focuses primarily on pragmatic considerations in moving away from the same-claim, same-evidence approach. To the extent relevant, I have a different view of the pragmatic implications of this case.
First, by requiring the bad-faith-claim to be joined in the breach-of-contract action whenever there is notice of a potential claim, we run the risk of complicating, not *740 simplifying, the litigation process. Prior to this case, the parties could litigate the relatively simple and contained policy claim first. If the plaintiff did not prevail, that would be the end of the matter, as a bad-faith claim cannot be brought after an unsuccessful policy claim. See Johnson v. Farm Bureau Mut. Ins. Co., 533 N.W.2d 203, 207 (Iowa 1995) (upholding denial of coverage, resulting in failure of bad-faith claim). The majority rule may tend to unnecessarily escalate disputes by requiring joinder of contract and bad-faith claims if the plaintiff is on notice of such a claim.
Further, the notice question will generate litigation regarding what plaintiffs knew and when they knew it. Moreover, the question of what amounts to notice will generate a body of easelaw; it seems to me, at a minimum, a mere assertion by plaintiffs counsel of the possibility of a future bad-faith claim — a standard lawyer’s tactic that does not amount to notice — should not be enough. In any event, the notice feature of the majority opinion will generate a new arena of dispute not present in current law.
Further, the requirement that the plaintiffs join a bad-faith claim to a contract action in order to preserve it gives rise to a number of thorny issues. Will there be simultaneous discovery, or will discovery of the contract claim go first? Thus, a preliminary battle must be fought at the beginning of the litigation over proper sequencing. In this case, the district court indicated that if the contract and bad-faith claims were joined, discovery would proceed first on the contract claim. See Warnke v. IMT Ins. Co., 657 N.W.2d 715, 716-17 (Iowa 2003) (per curiam); see also Brown, 670 P.2d at 728 n. 1 (“[Tjhere are many problems involved in allowing a claimant simultaneously to pursue both a claim under the coverage provided by the policy and a bad-faith claim based upon the insurer’s refusal to pay the policy claim. One could plausibly argue that the law should not allow such simultaneous actions and that a bad-faith claim can be pursued only after disposition of the underlying policy claim.”). Only after the contract claim was resolved would there be discovery on the bad-faith claim, including potential disclosure of the claims file and other internal documents related to the insurer’s handling of the claim. There would thus be apparently two separate juries to consider each claim. Very little would be gained in terms of efficiency under this scenario.
On the other hand, a court could allow simultaneous discovery on all issues. See, e.g., Handley, 467 N.W.2d at 250. If there is simultaneous discovery on both issues, the efficiency goals of the majority may also be minimized as the hand-to-hand combat on discovery issues that often accompanies a bad-faith claim may engulf the proceedings. The complications can include questions regarding the proper scope of work product and attorney-client privileges, whether an exception to these privileges applies, or whether the protections generally afforded by these privileges has been waived. See Ashley at § 10:29-:31 (discussing discovery in bad-faith cases involving attorney-client privilege, work product, and discovery of reserves); 1 Steven Plitt & Jordan Ross Plitt, Practical Tools for Handling Insurance Cases § 7.24 (2011); Donna Gooden Payne, Note, Insurer Bad Faith: The Need for an Exception to the Attorney-Client Privilege, 11 Rev. Litig. Ill (1991); Steven Plitt, The Elastic Contours of Attorney-Client Privilege and Waiver in the Context of Insurance Company Bad Faith: There’s a Chill in the Air, 34 Seton Hall L.Rev. 513 (2004). In short, under the majority approach, there may be more bad-faith claims, more focus on bad-faith *741 discovery, and few expeditious resolutions of contract disputes.
Second, the majority opinion puts attorneys in a potentially difficult position. The majority fires a warning shot that bringing a bad-faith claim could give rise to sanctions yet requires the claim to be brought in a breach-of-contract action when the claim may not be fully developed. See Camus v. State Farm Mut. Auto. Ins. Co., 151 P.3d 678, 681 (Colo.App.2006). The end result is that an attorney will have the following choice: bring the claim at the onset of the litigation and risk sanctions, or seek to develop the claim through the contract case and amend later. The latter course, however, might run the risk that the amendment might be denied as an undue expansion of issues. Further, to the extent the majority’s new regime discourages plaintiff’s counsel from bringing a bad-faith claim at the outset but requires a later amendment dramatically broadening proceedings as the claim develops, there is a very real prospect that continuances may be required to allow the parties to fully develop the later claim.[9]
In the end, I doubt that much efficiency will be achieved by the majority’s approach. The chairs on the deck have certainly been rearranged. Our prior same-claim, same-evidence precedents have been seriously undermined, if not effectively overruled, at least in the context of first-party bad-faith insurance litigation. Certainly little will be achieved, and much may in fact be lost, by the majority’s departure from this court’s long line of same-claim, same-evidence precedents. The holding does, however, deny the plaintiff his day in court on this potentially valid bad-faith claim, no question about that. I would have thought this court would prefer to give a party a day in court rather than pursue the speculative benefits that will supposedly result from the court’s departure from our established caselaw.
In conclusion, I note that the majority does not overrule our cases emphasizing the role of the same claim and the same evidence. Thus, these factors will continue to inform our view of claim preclusion under the Restatement (Second), section 24, and will likely produce a narrower view of the application of the doctrine under Iowa law than under more aggressive caselaw in other jurisdictions.
III. Conclusion.
For the above reasons, I would reverse the decision of the district court and remand this case for trial of the bad-faith claim.
WIGGINS and HECHT, JJ, join this dissent.

. My reading of Leuchtenmacher and B & B Asphalt is supported by Huffey v. Lea, 491 N.W.2d 518 (Iowa 1992). In Huffey, we considered whether a beneficiary could bring an action for tortious interference with a will after the beneficiary had previously litigated a will contest involving the same parties. Id. at 519-20. We concluded that claim preclusion did not bar the subsequent action, emphasizing the state of mind required to support a tortious-interference action which was absent from the will contest. Id. at 521-22. The majority opinion in this case essentially adopts the view espoused by the Huffey dissent. See id. at 523-27 (McGiverin, C.J., dissenting). Whether Huffey is good law after today is unclear.

. The majority opinion also turns the attention of defense counsel toward possible sanctions in bad-faith litigation, I doubt that the majority's use of the sanctions as bellows to blow judicial air over the hot coals of bad-faith controversies will have a cooling effect.